## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ALEJANDRO ALDANA and SCOTT GALLIE, individually and on behalf of all others similarly situated,<br><br>                              Plaintiffs,<br><br>        v.<br><br>GAMESTOP, INC.,<br><br>                              Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Alejandro Aldana and Scott Gallie ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by and through their attorneys, make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves and their counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.       This is a class action suit brought on behalf of all persons with Facebook accounts who purchased video games through gamestop.com.

2.       Gamestop, Inc., ("Defendant") is "the world's biggest game retailer."[1]  Defendant sells video games through its website, gamestop.com ("Gamestop").  To solicit additional purchases, Defendant knowingly collects and discloses its purchasers' personally identifiable information—including a record of every video game they purchase—to Facebook without consent.

---

[1] Ben Gilbert, *The world's biggest video game retailer, GameStop, is dying: Here's what led to the retail giant's slow demise*, BUS. INSIDER (Jan. 23, 2020), https://www.businessinsider.com/gamestop-worlds-biggest-video-game-retailer-decline-explained-2019-7.

3.     The United States Congress passed the Video Privacy Protection Act ("VPPA") in 1988, seeking to confer onto consumers the power to "maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers." S. Rep. No. 100-599, at 8. "The Act reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent." *Id.*

4.     Defendant violated the VPPA by knowingly transmitting Plaintiffs' and the putative class's personally identifiable information to unrelated third parties.

## FACTUAL BACKGROUND

## I.     The VPPA

5.     The origins of the VPPA begin with President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court. During the confirmation process, a movie rental store disclosed the nominee's rental history to the Washington City Paper which then published that history. Congress responded by passing the VPPA, with an eye toward the digital future. As Senator Patrick Leahy, who introduced the Act, explained:

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home. In an area of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone. I think that is wrong.

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

6.     The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). The VPPA defines personally identifiable information as "information

which identifies a person as having requested or obtained specific video materials or services from a video service provider." 18 U.S.C. § 2710(a)(3). A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

## II.     The Facebook Tracking Pixel

7.     Facebook is the largest social networking site on the planet, touting 2.9 billion monthly active users.[2] Facebook describes itself as a "real identity platform,"[3] meaning users are allowed only one account and must share "the name they go by in everyday life."[4] To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[5]

8.     Facebook generates revenue by selling advertising space on its website.[6]

9.      Facebook sells advertising space by highlighting its ability to target users.[7] Facebook can target users so effectively because it surveils user activity both on and off its site.[8] This allows Facebook to make inferences about users beyond what they explicitly disclose, like

---

[2] Sean Burch, *Facebook Climbs to 2.9 Billion Users, Report 29.1 Billion in Q2 Sales*, YAHOO (July 28, 2021), https://www.yahoo.com/now/facebook-climbs-2-9-billion-202044267.html
[3] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).
[4] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.
[5] FACEBOOK, SIGN UP, https://www.facebook.com/
[6] Mike Isaac, *Facebook's profit surges 101 percent on strong ad sales.*, N.Y. TIMES (July 28, 2021), https://www.nytimes.com/2021/07/28/business/facebook-q2-earnings.html.
[7] FACEBOOK, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.
[8] FACEBOOK, ABOUT FACEBOOK PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

their "interests," "behavior," and "connections."[9]  Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[10]

10.     Advertisers can also build "Custom Audiences."[11]  Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[12] Advertisers can use a Custom Audience to target existing customers directly, or they can use it to build a "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[13]  Unlike Core Audiences, Custom Audiences require an advertiser to supply the underlying data to Facebook.  They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools," which collect and transmit the data automatically.[14] One such Business Tool is the Facebook Tracking Pixel.

11.     The Facebook Tracking Pixel is a piece of code that advertisers, like Defendant, can integrate into their website.  Once activated, the Facebook Tracking Pixel "tracks the people

---

[9] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.
[10] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.
[11] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.
[12] FACEBOOK, ABOUT EVENTS CUSTOM AUDIENCE, https://www.facebook.com/business/help/366151833804507?id=300360584271273.
[13] FACEBOOK, ABOUT LOOKALIKE AUDIENCES, https://www.facebook.com/business/help/164749007013531?id=401668390442328.
[14] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; FACEBOOK, CREATE A WEBSITE CUSTOM AUDIENCE, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

and type of actions they take."[15]  When the Facebook Tracking Pixel captures an action, it sends

a record to Facebook.  Once this record is received, Facebook processes it, analyzes it, and

assimilates it into datasets like the Core Audiences and Custom Audiences.

12.     Advertisers control what actions—or, as Facebook calls it, "events"—the

Facebook Tracking Pixel will collect, including the website's metadata, along with what pages a

visitor views.[16]  Advertisers can also configure the Facebook Tracking Pixel to track other

events.  Facebook offers a menu of "standard events" from which advertisers can choose,

including what content a visitor views or purchases.[17]  An advertiser can also create their own

tracking parameters by building a "custom event."[18]

13.     Advertisers control how the Facebook Tracking Pixel identifies visitors.  The

Facebook Tracking Pixel is configured to automatically collect "HTTP Headers" and "Pixel-

specific Data."[19]  HTTP Headers collect "IP addresses, information about the web browser, page

location, document, referrer and persons using the website."[20]  Pixel-specific Data includes "the

Pixel ID and cookie."[21]

### III.     Gamestop And The Facebook Pixel

14.     Defendant's website advertises and sells thousands of video games.

---

[15] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.
[16] *See* FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED,
https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* FACEBOOK, BEST
PRACTICES FOR FACEBOOK PIXEL SETUP,
https://www.facebook.com/business/help/218844828315224?id=1205376682832142.
[17] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS,
https://www.facebook.com/business/help/402791146561655?id=1205376682832142.
[18] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS,
https://www.facebook.com/business/help/964258670337005?id=1205376682832142.
[19] FACEBOOK, FACEBOOK PIXEL, https://developers.facebook.com/docs/facebook-pixel/.
[20] *Id.*
[21] *Id.*

15.     Gamestop also hosts the Facebook Tracking Pixel which tracks customers throughout the purchase process.

16.     When a user searches for a video game, for example, Gamestop discloses event data labelled PageView and Microdata.

**Figure 1**



17.     PageView and Microdata data discloses what video games a user has searched.

**Figures 2 & 3**





18.     When a consumer clicks on the searched game, along with PageView and MicroData, Gamestop also discloses ViewContent, an event that explicitly lists the video game's title.

**Figure 4**



**Figures 5-7**



19.     When consumers add the video game to their cart, Gamestop discloses PageView,

ViewContent and Microdata, along with two additional events, ButtonClick and AddToCart.

**Figure 8**



**Figures 9-10**

| Button Click Automatically Detected | AddToCart |
|---|---|
| **CUSTOM PARAMETERS SENT** | **CUSTOM PARAMETERS SENT** |
| formFeatures: [] | value: 8.99 |
| buttonText: Add to Cart | contents: Hide |
| buttonFeatures: Hide | [{"id":"122063","quantity":"1"}] |
| {"classList":"add-to-cart btn btn-primary add-to-cart-redesign","destination":"","id":"add-to-cart","imageUrl":"","innerText":"Add to Cart","numChildButtons":0,"tag":"button","name":"","value":""} | content_name: Hide |
| | EA Sports UFC 2 - PlayStation 4 |
| pageFeatures: Hide | currency: USD |
| {"title":"EA Sports UFC 2 - PlayStation 4 \| PlayStation 4 \| GameStop"} | conetent_type: product |
| parameters: [] | |

20.     When checking out, Gamestop discloses PageView, Microdata, and Button Click

events.

**Figure 11**



**Figures 12-14**

Microdata Automatically Detected

CUSTOM PARAMETERS SENT

Schema.org: []
DataLayer: []
OpenGraph: Hide

{"og:type":"website","og:title":"Checkout | GameStop","og:url":"https://www.gamestop.com/spcheckout/","twitter:card":"summary_large_image","twitter:title":"Checkout | GameStop","twitter:description":"GameStop","og:description":"GameStop","og:image":"https://www.gamestop.com/on/demandware.static/Sites-gamestop-us-Site/-/default/v1649794083161/images/logo-gs-2.jpg"}

Button Click Automatically Detected

CUSTOM PARAMETERS SENT

formFeatures: []
buttonText: Use Proposed Address
buttonFeatures: Hide

{"classList":"btn btn-primary xav-address-btn mb-2","destination":"","id":"","imageUrl":"","innerText":"Use Proposed Address","numChildButtons":0,"tag":"button","name":"","value":""}

pageFeatures: Hide

{"title":"Checkout | GameStop"}

parameters: []

EVENT INFO

URL Called: Hide

https://www.facebook.com/tr/?id=178170037741173&ev=SubscribedButtonClick&dl=https%3A%2F%2Fwww.gamestop.com%2Fspcheckout%2F&rl=https%3A%2F%2Fwww.gamestop.com%2Fcheckout%2Flogin%2F&if=false&ts=1649794305222&cd%5BbuttonFeatures%5D=%7B%22classList%22%3A%22btn%20btn-primary%20xav-address-btn%20mb-2%22%2C%22destination%22%3A%22%22%2C%22id%22%3A%22%22%2C%22imageUrl%22%3A%22%22%2C%22innerText%22%3A%22Use%20Proposed%20Address%22%2C%22numChildButtons%22%3A0%2C%22tag%22%3A%22button%22%2C%22name%22%3A%22%22%2C%22value%22%3A%22%22%7D&cd%5BformFeatures%5D=%5B%5D&cd%5BpageFeatures%5D=%7B%22title%22%3A%22Checkout%20%7C%20GameStop%22%7D&cd%5Bparameters%5D=%5B%5D&sw=1920&sh=1080&udff%5BpN%5D=9b371696eabd8398b861de8c40d7d39e444aeed48d3bf6222f50d1c183c2515&v=2.9.57&r=stable&ec=3&o=2078&fbp=fb.1.1647801156227.117697009&lt=16497 9409770&coo=false&es=automatic&tm=3&exp=p1&rqm=GET&dt=rf1k91p9ybx6e10j1wk1dfm6k76tk7r

Button Click Automatically Detected

CUSTOM PARAMETERS SENT

formFeatures: Show
buttonText: SAVE & CONTINUE
buttonFeatures: Hide

{"classList":"btn btn-primary btn-block submit-shipping-address form submitButton","destination":"https://www.gamestop.com/spcheckout/","id":"","imageUrl":"","innerText":"SAVE & CONTINUE","numChildButtons":0,"tag":"button","name":"submit-shipping","value":"submit-shipping-address"}

pageFeatures: Hide

{"title":"Checkout | GameStop"}

parameters: []

EVENT INFO

URL Called: Hide

https://www.facebook.com/tr/?dt=b93d3vvdiayccivstjls7bo5Sb6sky1f

Load Time: 19.40 ms
Pixel Location: Hide

https://www.gamestop.com/spcheckout/

21.    To checkout, a user must click the button "Place Order."

**Figure 15**



22. When a user clicks "Place Order," Gamestop discloses that event to Facebook.

23. The event data disclosed by Gamestop permits an ordinary person to identify a purchased video game.

24. When a consumer purchases a video game while logged into Facebook, Gamestop compels a visitor's browser to transmit to Facebook the c_user cookie, which contains that visitor's unencrypted Facebook ID. When purchasing the above game, for example, Defendant compelled the browser to send eight cookies, seven of which are visible here:

**Figure 16**

| presence | C%7B%22t3%22%3... | .facebook.com |
|----------|-------------------|---------------|
| xs | 41%3AE51w5wpm1... | .facebook.com |
| datr | MaIzYjcua-RaV_XkU... | .facebook.com |
| sb | qqAzYsNOnTC8nEy... | .facebook.com |
| fr | 0rbLeQ9FE49K0mD... | .facebook.com |
| wd | 1292x959 | .facebook.com |
| c_user | 100035966074568 | .facebook.com |

25.     When a visitor's browser has recently logged out of Facebook,  Defendant will compel the browser to send a smaller set of cookies:

**Figure 17**

| | | |
|---|---|---|
| fr | 0W3d3FkEC2jPGTiY... | .facebook.com |
| datr | MalzYjcua-RaV_XkU... | .facebook.com |
| sb | qqAzYsNOnTC8nEy... | .facebook.com |
| locale | en_US | .facebook.com |
| wd | 1738x959 | .facebook.com |
| _fbp | fb.1.1647801156227... | .gamestop.com |

26.     The fr cookie contains, at least, an encrypted Facebook ID and browser identifier.[22]  The _fbp cookie contains, at least, an unencrypted value that uniquely identifies a browser.[23]  The datr cookies also identifies a browser. [24]  Facebook, at a minimum, uses the fr and _fbp cookies to identify users.[25]

27.     If a visitor has never created a Facebook account, two cookies are transmitted:

**Figure 18**

| | | |
|---|---|---|
| _fbp | fb.1.16497... | .gamestop.com |
| fr | 0Em9HNk... | .facebook.com |

28.     Without a corresponding Facebook ID, the fr cookie contains, at least, an abbreviated and encrypted value that identifies the browser.  The _fbp cookie contains, at least, an unencrypted value that uniquely identifies a browser.  Facebook uses both for targeted advertising.

---

[22] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012),  http://www.europe-v-facebook.org/ODPC_Review.pdf.
[23] FACEBOOK, CONVERSION API, https://developers.facebook.com/docs/marketing-api/conversions-api/parameters/fbp-and-fbc/.
[24] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.
[25] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

29.     The fr cookie will expire after 90 days unless the visitor's browser logs back into Facebook.[26]  If that happens, the time resets, and another 90 days begins to accrue.[27]

30.     The _fbp cookie will expire after 90 days unless the visitor's browser accesses the same website.[28]  If that happens, the time resets, and another 90 days begins to accrue.[29]

31.     The Facebook Tracking Pixel uses both first- and third-party cookies.  A first-party cookie is "created by the website the user is visiting"—*i.e.*, Gamestop.[30]  A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook.[31]  The _fbp cookie is always transmitted as a first-party cookie.  A duplicate _fbp cookie is sometimes sent as a third-party cookie, depending on whether the browser has recently logged into Facebook.

32.     Facebook, at a minimum, uses the fr, _fbp, and c_user cookies to link to Facebook IDs and corresponding Facebook profiles.

33.     A Facebook ID is personally identifiable information.  Anyone can identify a Facebook profile—and all personal information publicly listed on that profile—by appending the Facebook ID to the end of Facebook.com.

---

[26] *See* FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.
[27] Confirmable through developer tools.
[28] *See* FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.
[29] Also confirmable through developer tools.
[30] PC MAG, FIRST-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/first-party-cookie.  This is confirmable by using developer tools to inspect a website's cookies and track network activity.
[31] PC MAG, THIRD-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/third-party-cookie.  This is also confirmable by tracking network activity.

34.     Through the Facebook Tracking Pixel's code, these cookies combine the identifiers with the event data, allowing Facebook to know, among other things, what video game a user has purchased.[32]

35.     By compelling a visitor's browser to disclose the c_user cookie alongside event data for video games, Gamestop knowingly discloses information sufficiently permitting an ordinary person to identify what video games a specific individual has purchased.

36.     By compelling a visitor's browser to disclose the fr and _fbp cookies alongside event data for video games, Gamestop knowingly discloses information sufficiently permitting an ordinary person to identify what video games a specific individual has purchased.

37.     By compelling a visitor's browser to disclose the fr cookie and other browser identifiers alongside event data for video games, Gamestop knowingly discloses information sufficiently permitting an ordinary person to identify what video games a specific individual has purchased.

38.     Facebook confirms that it matches activity from Gamestop with a user's profile. Facebook allows users to download their "off-site activity," which is a "summary of activity that businesses and organizations share with us about your interactions, such as visiting their apps or websites."[33]  Here, the off-site activity report confirms Facebook has received information identifying what video games a consumer has purchased:

---

[32] FACEBOOK, GET STARTED, https://developers.facebook.com/docs/meta-pixel/get-started.
[33] FACEBOOK, WHAT IS OFF-FACEBOOK ACTIVITY?,
https://www.facebook.com/help/2207256696182627.  As discussed there, the Off-Facebook Activity is only a "summary" and Facebook acknowledges "receiv[ing] more details and activity than what appears in your Facebook activity."  What is more, it omits "information we've received when you're not logged into Facebook, or when we can't confirm that you've previously used Facebook on that device."

**Figure 19**

| Activity received from gamestop.com | |
| --- | --- |
| ID | 178170037741173 |
| Event | PAGE_VIEW |
| Received on | January 9, 2022 at 1:26 PM |
| ID | 178170037741173 |
| Event | PAGE_VIEW |
| Received on | January 3, 2022 at 3:22 PM |
| ID | 321931382066160 |
| Event | PAGE_VIEW |
| Received on | February 9, 2021 at 12:32 PM |
| ID | 2347808105484326 |
| Event | PAGE_VIEW |
| Received on | February 9, 2021 at 12:32 PM |
| ID | 711136938980652 |
| Event | PAGE_VIEW |
| Received on | February 9, 2021 at 12:32 PM |
| ID | 2485086754916316 |
| Event | PAGE_VIEW |
| Received on | February 9, 2021 at 12:32 PM |
| ID | 321931382066160 |
| Event | PURCHASE |
| Received on | February 9, 2021 at 12:08 PM |

39.     Defendant also uploads customer lists to Facebook that contain subscribers' email address and purchase information, including what video games they purchased.  Defendant

uploads these lists lists so Facebook can match subscribers to their Facebook profiles.  As Facebook describes the process: "[Advertisers] provide us with information about [their] existing customers and we match this information with Facebook profiles."[34]   The customer lists must contain "'identifier[s]' (such as email, phone number, address),"[35] that Facebook then matches to "Facebook profiles so that [advertisers] can advertise to [their] customers on Facebook, Instagram and Audience Network."[36]

40.     Defendant combines these customer lists with offline event data to effectively target subscribers.  When advertisers create an ad campaign, Facebook will "match the offline data [they] upload to the event set so that [they] can see how much [their] ads resulted in offline activity."[37]  Facebook also recommends that advertisers, like Defendant, provide an accurate timestamp for each event, down to "the minute or second."

---

[34] FACEBOOK, CREATE A CUSTOMER AUDIENCE LIST, https://www.facebook.com/business/help/170456843145568?id=2469097953376494.

[35] *Id.*

[36] FACEBOOK, ABOUT CUSTOMER LIST CUSTOM AUDIENCES, https://www.facebook.com/business/help/341425252616329?id=2469097953376494.

[37] FACEBOOK, UPLOAD OFFLINE EVENT DATA, https://www.facebook.com/business/help/155437961572700?id=565900110447546.

**Figure 20**



41.     As with Facebook's Business Tools, Defendant uploads customer lists and offline events so it can match a subscriber's video viewing history with her corresponding Facebook profile.

42.     Facebook again confirms this is true.  Facebook provides subscribers the ability to pull reports for "Audience-based advertising," which shows "Advertisers using your activity or information."  Defendant uploads list data to match subscribers with their video viewing history.

**Figure 21**



#### IV.    Experience of Plaintiff Alejandro Aldana

43.    In 2007, Plaintiff Aldana created a Facebook account.

44.    Plaintiff Aldana has purchased numerous video games from Gamestop, including

Lost Judgment, which contains video cut scenes such as the following:

**Figure 22**



45.     Plaintiff Aldana has completed these purchases by checking out as a guest.

46.     Unbeknownst to Plaintiff Aldana, each time he purchased a game, Defendant used a customer list to upload his personally identifiable information to Facebook.  This information specifically identified Plaintiff Aldana and what video games he purchased.

47.     Plaintiff Aldana discovered that Gamestop surreptitiously collected and disclosed his personally identifiable information in July 2022.

**V.     Experience of Plaintiff Scott Gallie**

48.     In 2009, Plaintiff Gallie created a Facebook account.

49.     Plaintiff Gallie has purchased numerous video games from Gamestop, including The Quarry, which contains video cut scenes such as the following:

**Figure 23**



Dylan: Ring-a-ding-a-ding- Ooh, sorry bud, gotta take this one second.

50.　　Plaintiff Gallie has completed these purchases by checking out as a guest.

51.　　Unbeknownst to Plaintiff Gallie, each time he purchased a game, Defendant used the Facebook Tracking Pixel to transmit his personally identifiable information to Facebook. This information specifically identified Plaintiff Gallie and what video games he purchased.

52.　　Plaintiff Gallie discovered that Gamestop surreptitiously collected and transmitted his personally identifiable information in July 2022.

## PARTIES

53.　　 Plaintiff Aldana is, and has been at all relevant times, a resident of Sunnyside, New York and has an intent to remain there, and is therefore a domiciliary of New York.

54.　　Plaintiff Gallie is, and has been at all relevant times, a resident of New York, New York and has an intent to remain there, and is therefore a domiciliary of New York.

55.      Defendant Gamestop, Inc. is a Minnesota corporation with its principal place of business at 625 Westport Parkway, Grapevine, Texas 76051.  Defendant develops, owns, and operates gamestop.com, which is used throughout New York and the United States.

## JURISDICTION AND VENUE

56.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the VPPA).

57.      This Court has personal jurisdiction over Defendant because Defendant disclosed Plaintiff Gallie's personally identifiable information in this District.

58.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## CLASS ALLEGATIONS

59.      Class Definition:  Plaintiffs seek to represent a class of similarly situated individuals defined as all persons in the United States who have purchased a video game from Gamestop.

60.      Subject to additional information obtained through further investigation and discovery, the above-described Class may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

61.      **Numerosity (Fed. R. Civ. P. 23(a)(1)):**  At this time, Plaintiffs do not know the exact number of members of the aforementioned Class.  However, given the popularity of Defendant's website, the number of persons within the Class is believed to be so numerous that joinder of all members is impractical.

62.      **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3)):**  There is a well-defined community of interest in the questions of law and fact involved in this case.

Questions of law and fact common to the members of the Class that predominate over questions that may affect individual members of the Class include:

    a)   whether Defendant collected Plaintiffs' and the Class's PII;

    b)   whether Defendant unlawfully disclosed and continues to disclose its users' PII in violation of the VPPA;

    c)   whether Defendant's disclosures were committed knowingly; and

    d)   whether Defendant disclosed Plaintiffs' and the Class's PII without consent.

63.    **Typicality (Fed. R. Civ. P. 23(a)(3)):**  Plaintiffs' claims are typical of those of the Class because Plaintiffs, like all members of the Class, purchased video games from Gamestop and had their PII collected and disclosed by Defendant.

64.    **Adequacy (Fed. R. Civ. P. 23(a)(4)):** Plaintiffs have retained and is represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation, including litigation concerning the VPPA and its state-inspired offspring. Plaintiffs and their counsel are committed to vigorously prosecuting this class action.  Moreover, Plaintiffs are able to fairly and adequately represent and protect the interests of the Class. Neither Plaintiffs nor their counsel have any interest adverse to, or in conflict with, the interests of the absent members of the Class.  Plaintiffs have raised viable statutory claims or the type reasonably expected to be raised by members of the Class, and will vigorously pursue those claims.  If necessary, Plaintiffs may seek leave of this Court to amend this Class Action Complaint to include additional representatives to represent the Class, additional claims as may be appropriate, or to amend the definition of the Class to address any steps that Defendant took.

65.    **Superiority (Fed. R. Civ. P. 23(b)(3)):**  A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual

litigation of the claims of all members of the Class is impracticable.  Even if every member of the Class could afford to pursue individual litigation, the court system could not.  It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.  Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues.  By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Class.  Plaintiffs anticipate no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF THE VIDEO PRIVACY PROTECTION ACT
### 18 U.S.C. § 2710, *et seq.*

66.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

67.     Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendant.

68.     Defendant is a "video tape service provider" because it offers thousands of video games for sale on its website, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

69.     Plaintiffs and members of the Class are "consumers" because they purchased video games.  18 U.S.C. § 2710(a)(1).

70.     Defendant disclosed to a third party, Facebook, Plaintiffs' and the Class members' personally identifiable information.  Defendant utilized the Facebook Tracking Pixel to compel Plaintiffs' web browser to transfer Plaintiffs' identifying information, like their Facebook ID, along with Plaintiffs' event data, like the title of the video games he purchased.

71.     Plaintiffs and the Class members purchased video games from Defendant.

72.     Defendant knowingly disclosed Plaintiffs's and the Class members' personally identifiable information because it used that data to build audiences on Facebook to retarget them for its advertising campaigns.

73.     Plaintiffs and Class members did not provide Defendant with any form of consent—either written or otherwise—to disclose their PII to third parties.

74.     Nor were Defendant's disclosures made in the "ordinary course of business" as the term is defined by the VPPA.  In particular, Defendant's disclosures to Facebook were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership."  18 U.S.C. § 2710(a)(2).

75.     On behalf of themselves and the Class, Plaintiffs seek: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the Class by requiring Defendant to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs seek a judgment against Defendant, individually and on behalf of all others similarly situated, as follows:

(a)   For an order certifying the Class under Rule 23 of the Federal Rules of Civil

Procedure, naming Plaintiffs as representatives of the Class, and naming

Plaintiffs' attorneys as Class Counsel to represent the Class;

(b)   For an order declaring that Defendant's conduct violates the statutes referenced

herein;

(c)   For an order finding in favor of Plaintiffs and the Class on all counts asserted

herein;

(d)   An award of statutory damages to the extent available;

(e)   For punitive damages, as warranted, in an amount to be determined at trial;

(f)   For prejudgment interest on all amounts awarded;

(g)   For injunctive relief as pleaded or as the Court may deem proper; and

(h)   For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and

expenses and costs of suit.

## **JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b)(1), Plaintiffs demand a trial by jury of all issues so

triable.

Dated: August 18, 2022                              Respectfully submitted,

By: */s/ Joshua D. Arisohn____*


**BURSOR & FISHER, P.A.**
Joshua D. Arisohn
Philip L. Fraietta
888 Seventh Avenue
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
E-Mail: jarisohn@bursor.com
            pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Christopher R. Reilly*
701 Brickell Avenue, Suite 1420
Miami, FL 33131
Tel: (305) 330-5512
Fax: (305) 679-9006
E-Mail:  creilly@bursor.com

*Pro Hac Vice Application Forthcoming*

*Attorneys for Plaintiffs and the Putative Class*