UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALEJANDRO ALDANA and SCOTT GALLIE, individually and on behalf of all others similarly situated,<br><br>　　　　　　　　　　Plaintiffs,<br><br>　　　v.<br><br>GAMESTOP, INC.,<br><br>　　　　　　　　　　Defendant. | Case No. 22-cv-07063-VSB<br><br><br><br>ORAL ARGUMENT REQUESTED |

**GAMESTOP'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS
<u>PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 3

LEGAL STANDARD........................................................................................................... 5

ARGUMENT ..................................................................................................................... 6

I.     GameStop Is Not a Video Tape Service Provider ............................................... 6

    A.  Video games are not "prerecorded video cassette tapes or similar audio visual
         materials." .................................................................................................... 6

    B.  GameStop is not "engaged in the business" of providing pre-recorded video tapes or
         similar materials. ........................................................................................ 12

II.    GameStop Does Not Knowingly Disclose Personally Identifiable Information ............... 15

    A.  A video game purchase does not reveal the specific video material a person requested or
         obtained. ..................................................................................................... 15

    B.  Technical documentation confirms that GameStop did not disclose information linking
         purchase data to any individual. ................................................................. 18

       1.  Unidentified purchase data is not personally identifiable information. ...................... 18

       2.  Facebook's cookies are not personally identifiable information. .............................. 19

       3.  GameStop does not disclose the cookie—the user's browser does. ......................... 22

       4.  The customer lists allegations are contradicted by public documentation incorporated
          by reference in the FAC. ........................................................................... 23

III.   Plaintiffs Do Not Allege a Knowing Disclosure of PII .................................... 24

CONCLUSION................................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

Cases

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..................................................................................................... 5-6, 25

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)............................................................................................................6

*Bernardino v. Barnes & Noble Booksellers, Inc.*,
No. 17CV04570LAKKHP, 2017 WL 3727230 (S.D.N.Y. Aug. 11, 2017) ......................... 20, 22

*Dancel v. Groupon, Inc.*,
949 F.3d 999 (7th Cir. 2019) ...........................................................................................24

*DiFolco v. MSNBC Cable L.L.C.*,
622 F.3d 104 (2d Cir. 2010).............................................................................................22

*Eichenberger v. ESPN, Inc.*,
876 F.3d 979 (9th Cir. 2017) ..............................................................12, 16, 17, 19, 21

*Ellis v. Cartoon Network, Inc.*,
No. 1:14-CV-484-TWT, 2014 WL 5023535 (N.D. Ga. Oct. 8, 2014) ....................................21-22

*Ellis v. Cartoon Network, Inc.*,
803 F.3d 1251 (11th Cir. 2015) ............................................................................. 16, 17-18

*In re Facebook, Inc., Consumer Priv. User Profile Litig.*,
402 F. Supp. 3d 767 (N.D. Cal. 2019) ............................................................................14

*In re Hulu Priv. Litig.*,
No. C 11-03764 LB, 2012 WL 3282960 (N.D. Cal. Aug. 10, 2012) .............................................8

*In re Hulu Priv. Litig.*,
No. C 11-03764 LB, 2014 WL 1724344 (N.D. Cal. Apr. 28, 2014) ................................ 18, 19-20

*In re Hulu Priv. Litig.*,
86 F. Supp. 3d 1090 (N.D. Cal. 2015) ............................................................................15, 18, 25

*In re Nickelodeon Consumer Privacy Litig.*,
827 F.3d. 262 (3d Cir. 2016)............................................................................. 12, 17, 19

*In re Vizio, Inc., Consumer Priv. Litig.*,
238 F. Supp. 3d 1204 (C.D. Cal. 2017) .........................................................................9, 13-15

*McMillan v. Amazon.com, Inc.*,
983 F.3d 194 (5th Cir. 2020) ....................................................................13

*Robinson v. Disney Online*,
152 F. Supp. 3d 176 (S.D.N.Y. 2015).......................................16, 18, 19, 21

*Stark v. Patreon, Inc.*,
No. 22-CV-03131-JCS, 2022 WL 7652166 (N.D. Cal. Oct. 13, 2022).............. 11-12, 21

*United States v. Kozeny*,
541 F.3d 166 (2d Cir. 2008)........................................................................7

*United States v. Martinez-Santos*,
184 F.3d 196 (2d Cir. 1999)........................................................................8

*United States. v. Stanko*,
491 F.3d 408 (8th Cir. 2007) ......................................................................8

*United States v. W.R. Grace & Co.*,
166 F. 748 (2d Cir. 1909) ...........................................................................8

*U.S. Commodity Futures Trading Comm'n v. Byrnes*,
No. 13-CV-1174 (VSB), 2019 WL 4515209 (S.D.N.Y. Sept. 19, 2019) ......................7

*Wilson v. Triller, Inc.*,
No. 21-CV-11228 (JSR), 2022 WL 1138073 (S.D.N.Y. Apr. 18, 2022) ...................16, 18, 19, 21

Statutes and Rules

17 U.S.C. § 109 ........................................................................................10

18 U.S.C. § 2320 ......................................................................................10

18 U.S.C.A. § 2320(h)(2)(a)(i) .................................................................10

Video Privacy Protection Act
    18 U.S.C. § 2710.................................................................................1, 4
    18 U.S.C. § 2710(a)(3)................................................................2, 15, 21
    18 U.S.C. § 2710(a)(4)...........................................................1-2, 6-7, 13
    18 U.S.C. § 2710(b)(1) ............................................................................24

42 U.S.C. § 300u-13 .................................................................................10

Fed. R. Civ. P. 8(a)(2) .................................................................................6

Fed. R. Civ. P. 12(b)(6)..........................................................................5, 22

Legislative Materials
S. Rep. No. 100-599 (1988)..............................................................................9, 11

Other Authorities
Black's Law Dictionary (6th ed. 1990)......................................................................8

Cookies & Other Storage Technologies, Meta,
https://www.facebook.com/policy/cookies....................................................5, 22, 23

Create a Customer List Custom Audience, Meta,
https://www.facebook.com/business/help/170456843145568?id=24690979533764 ............ 23-24

How to Format Customer Lists, Meta,
https://www.facebook.com/business/help/2082575038703844?id=2469097953376494 ............24

Merriam-Webster, https://www.merriam-webster.com/dictionary/request............................ 15-16

Merriam-Webster, https://www.merriam-webster.com/dictionary/obtain ..................................16

## INTRODUCTION

"Game Over," beeps the console as Pac-Man fades to black. Having used all three lives, you have no choice but to restart at level one, joystick in hand. This time around, you again try to keep your Pac-Man away from the ghosts, but they take a different route around the maze each time and thus, so do you. When you do manage to beat the game, all 255 levels, you likely will have spent more than 10 hours playing the game over the course of days, weeks, or months. In between certain levels there may be a short scene of Pac-Man and the ghosts interacting, but you did not choose the scenes when purchasing the game and have no ability to watch the scenes together from start to finish; in fact, you cannot even access a scene unless you successfully beat the level before. Whether you ever manage to unlock the scenes or not, nothing about your personal preferences for video content was revealed.

To survive this Motion to Dismiss, the First Amended Complaint in this case must plausibly allege that video games, whether Pac-Man or Lost Judgment, are sufficiently similar to pre-recorded video tape materials and that a gaming retailer should be deemed to fall within the definition of a video tape service provider. This Court also would have to conclude what no other court has done: that Congress intended to regulate video games when it drafted a statute concerning "video tape rental or sale records." 18 U.S.C. § 2710 (title of Video Privacy Protection Act). With these far-fetched hopes in mind, Plaintiffs bring a single claim against GameStop pursuant to the Video Privacy Protection Act ("VPPA"), enacted in 1988 following a newspaper's publication of the movies Judge Bork rented from his local video store. 18 U.S.C. § 2710 *et seq.* But a video game is not a movie. And as the statutory text compels, the VPPA is not a catch-all federal privacy law covering anything a person might read, listen to, or play. The statute applies exclusively to "video tape service providers"—those "engaged in the business" of "rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials."

1

18 U.S.C. § 2710(a)(4).  And its protections are limited to the disclosure of "personally identifiable information"—information that identifies a person as having "requested or obtained specific video materials or services from a video tape service provider."  18 U.S.C. § 2710(a)(3).

The First Amended Complaint ("FAC") does not plausibly plead either element. GameStop does not trade in pre-recorded video cassette tapes, nor are video games audio visual materials "similar" to pre-recorded video tapes: they are games, a form of interactive and competitive play involving active engagement, skill, knowledge, and sometimes chance.  That certain video games may contain brief video scenes inserted into the game to help develop backstory does not alter a game's nature and transform it into a movie, any more than a board game's use of illustrations would convert the board game into a comic book, or a video advertisement for drills on Home Depot's webpage would make it a movie theater.

Recognizing this gap, Plaintiffs amended the complaint in response to GameStop's motion to dismiss the original complaint to add quotes from various stories and articles discussing video games being on disks.  Their argument appears to be because video games used to be issued on CD-ROM disks and some movies were also released on disks, video games are audio visual materials similar to pre-recorded video cassette tapes.  But just because both things can be found on disks does not make a video game a pre-recorded video tape or similar audio visual material, any more than a DVD is a video game because you can watch it on a PlayStation.  Just like on-demand streaming movies are covered by the statute even if they are not recorded on disks, not everything recorded on disks counts as a movie.  Plaintiffs' reading would leave no coherent way for this Court to limit a video tape privacy statute to its intended scope.  The additional allegations do not save this case from dismissal.

Even if a video game retailer conceivably could constitute a video tape service provider,

the FAC does not plausibly allege what "personally identifiable information" GameStop purportedly discloses.  Plaintiffs aver that GameStop shares "event data" identifying "a purchased video game" with Facebook, *id.* ¶ 30, but do not plausibly allege that the data links a purchase to a user.  Even if one accepts their claim that brief video scenes (known as "cut scenes") in video games are like movies, Plaintiffs allege merely that the title of the video game was disclosed, not which video scenes (i.e., which "specific video materials or services") each Plaintiff watched.  A video game is not a movie.  Furthermore, in trying to plead a disclosure of personally identifiable information, Plaintiffs resort to naming a number of cookies that purportedly transmit a user's Facebook ID to Facebook, but these cookies belong to Facebook, are accessible only by Facebook, and are stored on a user's browser at Facebook's direction, independent of GameStop.  This is confirmed by Facebook's public documentation repeatedly incorporated by reference in the FAC, and the FAC does not plead factual matter plausibly contradicting such documentation.

Although courts have interpreted the VPPA to apply to businesses that use new technology such as streaming video in place of DVDs, which replaced video cassettes, those courts did so only after determining that they deliver content similar to content stored on video tapes.  No court has read into the VPPA an entirely new category of products not named in the text.  Congress was certainly aware of video games in 1988 and did not include them in the VPPA.  And Congress was again aware of video games and their development in the 1990s when it amended the VPPA in 2013 and declined to expand the statute's coverage.  These multiple bases each independently bar Plaintiffs' claim, and the Court should dismiss the FAC with prejudice.

## BACKGROUND

Since the 1980s, video game retailer GameStop has sold video games and gaming

accessories, including through its website gamestop.com.  Its website offers a range of games and accessories like video games; board, card, and puzzle games; gaming consoles; gaming controllers; and electronics—but all gaming-related and -focused.  Despite GameStop being a video game business, Plaintiffs bring a single claim under the VPPA based on a theory that GameStop is a "video tape service provider" because it "offers . . . video games for sale on its website."  FAC ¶ 75; *see also* 18 U.S.C. § 2710.  To state a prima facie VPPA claim, Plaintiffs must plausibly plead that GameStop is a "video tape service provider" and knowingly shares "personally identifiable information" as defined in the statute.

In support of its assertion that GameStop is a video tape service provider, the FAC alleges that GameStop sold two video games which allegedly contain "cut scenes," brief scenes spliced into certain video games to help develop backstory and spectacle and provides a screenshot from each video game.  Figure 22 shows that video game cut scenes generally can be skipped by the player.  *See* FAC at 21, Fig. 22 (showing "Skip" button at bottom right corner).  The FAC does not allege that the player can select what scenes accompany a particular video game or choose what scene to watch at a given point in the game.  Neither does the FAC allege that GameStop discloses what specific cut scenes a video game purchaser did or did not watch.

After GameStop moved to dismiss the Complaint, Plaintiffs filed a FAC purportedly to show a connection between "The VPPA and Video Games."  *Id.* § II.  Ostensibly based on the legislative history's reference to "laser disks" and "CDI technologies," the FAC urges that the VPPA applies to anything that can be stored on disks, like laser disks, CD-ROMs, and Blu-ray disks.  *See id.* ¶ 7 (alleging that various disks are "similar audio visual materials"); *id.* ¶ 13 (alleging that 100GB Blu-ray disks are "audio-visual material[s]").  Because certain video games were distributed on such disks, Plaintiffs reason, all video games fall within the VPPA's scope.

Plaintiffs recognize, however, that these disks also contained myriad non-video materials, like "text," "quizzes," "audio," and "computer-generated images." *Id.* ¶¶ 8, 11. The news articles they cite also distinguish between films and the interactive medium of video games. *See id.* ¶ 9 (article separately listing computer games and movies); *id.* ¶ 10 (article describing video games as a "form[] of interactive entertainment"); *id.* ¶ 11 (article stating that games permit the player "to interact with the material"). The FAC itself concedes this, describing video games as "interactive content" and "an interactive experience." *Id.* ¶ 11.

Plaintiffs assert that GameStop discloses personally identifiable information because it shares data on "a purchased video game" with Facebook. *Id.* ¶ 30. The FAC does not allege that data GameStop itself discloses includes any information linkable to a particular person. *See id.* ¶¶ 29-30. Rather, the FAC avers that Facebook IDs or browser identifiers are transmitted to Facebook via three cookies, "c_user," "_fbp", and "fr." The public documentation incorporated by reference in the FAC, however, explains that these cookies belong to Facebook, are stored by Facebook, and transmit data from a browser to Facebook. *See* Cookies & Other Storage Technologies, Facebook, https://www.facebook.com/policy/cookies (incorporated by reference at FAC ¶ 33 nn.24-25, ¶ 35 n.26, ¶ 37 n.28). For example, Facebook says of the c_user cookie, "we [i.e., Facebook] use the 'c_user' and 'xs' cookies, including for this purpose" of "keep[ing] you logged in as you navigate between Facebook Pages" and "help[ing] us [i.e., Facebook] remember your browser so you don't have to keep logging in to Facebook." *Id.*

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* The rule that a court

accept as true allegations in a complaint is "inapplicable to legal conclusions," *id.*, and "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  If the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"  *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).  "Determining whether a complaint states a plausible claim for relief" is "a context-specific task" that requires a court "to draw on its judicial experience and common sense."  *Id.*

## ARGUMENT

## I.      GameStop Is Not a Video Tape Service Provider

Plaintiffs' claim fails first and foremost because the VPPA does not apply to GameStop's sale of video games.  That alone is a sufficient ground to dismiss the FAC with prejudice.  The VPPA is a video privacy law directed only at video tape service providers, entities engaged in the business of selling "prerecorded video cassette tapes or similar audio visual materials."  18 U.S.C. § 2710(a)(4).  Video games are neither pre-recorded video tapes nor audio visual materials "similar" to pre-recorded video tapes.  They are games users play on a console using a controller to direct the actions of the characters.  That certain video games incorporate audio visual elements like brief scenes do not transform games into films, television shows, or video clips.  Even if cut scenes and VHS tapes were deemed to contain "similar" materials, GameStop indisputably does not "engage in the business of" selling or delivering cut scenes.  For these independent reasons, Plaintiffs' claim should be dismissed.

### A.      Video games are not "prerecorded video cassette tapes or similar audio visual materials."

To plead video tape service provider status, Plaintiffs must allege facts plausibly showing that GameStop rents, sells, or delivers "prerecorded video cassette tapes or similar audio visual

6

materials." 18 U.S.C. § 2710(a)(4) (defining video tape service provider). The FAC sets forth a single allegation to make this showing, that "Defendant is a 'video tape service provider' because it offers thousands of video games for sale on its website." FAC ¶ 75. That assertion does not plausibly show that GameStop trades in pre-recorded video tapes or offers "similar" audio visual materials for sale.

It is indisputable that video games are not pre-recorded video cassette tapes. Commonly abbreviated as VHS, video cassette tapes were a storage medium for pre-recorded videos like films and television broadcasts. GameStop does not sell any VHS tapes, much less engage in the business of delivering pre-recorded video tapes.

Nor do video games constitute audio visual materials "similar" to pre-recorded video cassette tapes. The VPPA does not define "similar audio visual materials," but both common sense and rules of statutory construction indicate that they are not. Such rules of construction direct courts "to give effect, if possible, to every clause and word of a statute" and, in turn, "avoid statutory interpretations that render provisions superfluous." *United States v. Kozeny*, 541 F.3d 166, 174 (2d Cir. 2008) (citations omitted). This Court has recognized this rule as "one of the most basic interpretive canons" and reiterated "that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *U.S. Commodity Futures Trading Comm'n v. Byrnes*, No. 13-CV-1174 (VSB), 2019 WL 4515209, at *6 n.16 (S.D.N.Y. Sept. 19, 2019) (Broderick, J.).

Here, Congress did not choose to regulate providers of "any" audio visual content or "other" audio visual content; nor did it, via silence, leave the issue to ambiguity. To the contrary, it expressly limited the VPPA's applicability to providers of pre-recorded video tapes or audio visual materials "similar" to pre-recorded video tapes. This textual choice necessarily

precludes any argument that the VPPA applies to "all" video content; if that were the case, "similar" would be read out of the statute.  Such an argument is especially untenable because "similar" in particular indicates a congressional intent to "restrict" the modified category: in a different case construing the provision "Books, libraries, usual and reasonable furniture, and similar household effects," the Second Circuit unequivocally concluded that "[t]he insertion of the word 'similar' indicates that Congress intended to do away with the exemption of household effects generally, and to restrict it to such [sic] as should be like books, libraries, or household furniture."  *United States v. W.R. Grace & Co.*, 166 F. 748, 749 (2d Cir. 1909).  Thus, unless the defendant provides pre-recorded video tapes, the FAC must allege that it delivers audio visual materials that are "similar" to pre-recorded video cassette tapes, or else it should be dismissed.

Plaintiffs do not and cannot make this showing.  In the Second Circuit, "similar" is given its ordinary or common meaning, *United States v. Martinez-Santos*, 184 F.3d 196, 204 (2d Cir. 1999), which is a definition of "[n]early corresponding; resembling in many respects; somewhat like; having a general likeness," *Similar*, Black's Law Dictionary (6th ed. 1990); *see also United States. v. Stanko*, 491 F.3d 408, 414 (8th Cir. 2007) ("Congress use[s] the comparative term 'similar' to . . . . indicate[] an intent to limit the . . . clause's reach to offenses which are 'comparable' or 'nearly corresponding' to the enumerated offenses.").  In the VPPA context, providers of "similar audio visual materials" refers to businesses that use new technologies but for the purpose of delivering the same film, television, or video clip materials found in pre-recorded video tapes.  Every court to have directly addressed this issue has concluded as such. As just two examples, the court in *In re Hulu Privacy Litigation* concluded that the "similar audio visual materials" prong may cover platforms like Hulu because it uses "new technologies for pre-recorded video content," No. C 11-03764 LB, 2012 WL 3282960, at *5 (N.D. Cal. Aug.

10, 2012); and the court in *In re Vizio, Inc., Consumer Privacy Litigation* concluded that the VPPA may cover Vizio because its Smart TV enabled access to movie and television streaming platforms like Netflix, Hulu, YouTube, and Amazon Instant Video—all of which deliver the same pre-recorded video tape content, 238 F. Supp. 3d 1204, 1222 (C.D. Cal. 2017).

No court, however, has held that "similar" can commandeer the rest of the VPPA to sweep in "any sort of" audio visual materials or entirely different goods (like video games). This is further confirmed by the primary legislative history available, the Senate Report, which highlights as exemplars of "similar audio visual materials," laser disks, open-reel movies, and CDI technology. S. Rep. No. 100-599, at 12 (1988). These exemplars were different storage medium through which consumers could take home for private viewing the same content that could be found on videocassette tapes, not wholly different audio visual materials or goods. Stated another way, the VPPA's privacy protections extend "only those transactions involving the purchase of video tapes [or services] and not other products." *Id.*

Video games are not a "new technolog[y] for pre-recorded video content." Neither are they an audio visual material "similar" to pre-recorded video tapes. Put simply, they are games, fundamentally different from home videos, movies, and television. Video games do not play on their own; they are interactive, competitive, and player-driven. When Judge Bork rented and watched *The Star Chamber*, he would have pressed "play" on a VCR, sat back for the next ninety minutes, and watched as Michael Douglas's search for justice unfolded from start to end. If he had instead purchased Super Mario Bros., he would have engaged in an interactive, multi-part game that involved choosing a character, selecting a level, physically toggling the controller to jump over flying turtles, attempting some levels multiple times, and not being able to advance to new worlds without beating the prior one. How he ultimately rescued the Princess, if he even

9

did, could have taken many different routes, even if all of them ended with a brief video greeting from the Princess.  In short, video games bear no meaningful similarity to pre-recorded video tapes under the VPPA.

Indeed, it strains credulity to suggest that Congress intended to regulate video games by using the words "pre-recorded video cassette tapes or similar audio visual materials."  Where Congress has sought to regulate video games, it has done so loudly and clearly, by simply referring to video games by name.  *See, e.g.*, 18 U.S.C. § 2320 (statute expressly naming "video games"); 17 U.S.C. § 109 (same); 42 U.S.C. § 300u-13 (same).  And in the first of these examples, Congress required Department of Justice to report to it infringement cases involving different categories of works and specifically listed "video games" as a separate category from "audiovisual (videos and films)," the very subject matter covered by the VPPA.  *See* 18 U.S.C.A. § 2320(h)(2)(a)(i).  That the provision identifies audio visual works as a separate category from video games plainly confirms that Congress considers the two to be distinct, just as common sense would also dictate.  The FAC itself recognizes this, pasting in news quotes that repeatedly distinguish between video games and film.  *See* FAC ¶ 11 (Plaintiffs describing video games as "interactive content" and "an interactive experience"); *id.* ¶ 9 (article separately listing computer games and movies); *id.* ¶ 10 (article describing video games as a "form[] of interactive entertainment"); *id.* ¶ 11 (article stating that games permit the player "to interact with the material").

Plaintiffs are aware of the fundamental mismatch between video games and the VPPA, because the FAC makes no effort to compare video games themselves to pre-recorded video tapes.  They instead zero in on seven words from the Senate Report to argue that because movies and video games can be stored on disks, the two things must be "similar" audio visual materials.

FAC ¶¶ 7-13 (relying on Senate Report reference to "laser discs, open-reel movies, or CDI technology").  According to Plaintiffs, for example, the VPPA protects storage disks like "100GB Blu-ray discs" because such disks are "the same audio-visual material used for movies." *Id.* ¶ 13.  This is a strained reading of a straightforward statute.  The VPPA is a video privacy protection law; it protects certain audio visual content, not the physical storage medium itself.  Indeed, Plaintiffs themselves recognize that disks also store content like "text," "quizzes," "audio," and "computer-generated images" that are not even arguably protected by the VPPA. *Id.* ¶¶ 8, 11.  The same is true for video games.

The conclusion that the VPPA does not apply to video games is reinforced by the legislative history Plaintiffs omitted from the FAC.  All throughout the Senate Report, Congress reaffirmed that the VPPA was intended to protect video content in the form of film, television, or similar audio visual content.  It repeatedly states that the statute was intended to protect an individual's choice of films or television to watch.  *See, e.g.*, S. Rep. No. 100-599, at 4 ("Protecting an individual's choice of books and films is a second pillar of intellectual freedom . . . ."); *id.* ("[A] State has no business telling a man, sitting alone in his house, what books he may read or what films he may watch."); *id.* at 5 ("It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television . . . ."); *id.* at 7 ("There's a gut feeling that people ought to be able to read books and watch films without the whole world knowing.").  It repeatedly mentions audio visual material like "action, romance, science fiction," and Star Trek.  *Id.* at 12.   It never mentions video games.  *See Stark v. Patreon, Inc.*, No. 22-CV-03131-JCS, 2022 WL 7652166, at *6 (N.D. Cal. Oct. 13, 2022) (holding that live television providers are not video tape service providers because, "while broadcast, cable, and satellite television were all well established at the time of the VPPA's passage, there is nothing in the

statute's language suggesting that providers of such live broadcasts fall within its scope").

Plaintiffs' theory that the presence of cut scenes in video games makes the VPPA applicable to such games also fails.  Just like a board game's use of illustrations does not convert the board game into a comic book, interspliced cut scenes do not transform a video game into a film or television show.[1]  To find the VPPA extends to sellers of video games because those games contain "cut scenes" would sweep innumerable groups into the statute's reach.  A recording artist that includes animations or video on a screen behind the stage at a concert would be a video tape service provider because his or her concert has a video element.  The Museum of Modern Art would likewise be a video tape service provider because it includes video exhibits. This court would be a video tape service provider because its website includes cut scenes of introductory videos for jurors.[2]  These incidental uses of video are not the audio visual works Congress intended to protect when it enacted the VPPA.  *See In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d. 262, 288 (3d Cir. 2016) (noting the VPPA "serves different purposes, and protects different constituencies, than other, broader privacy laws"); *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985 (9th Cir. 2017)) ("[W]e are not persuaded that the 1988 Congress intended for the VPPA to cover circumstances so different from the ones that motivated its passage.").

At bottom, this Court should not have to splice and dice subparts of a subset of video games to bring Plaintiffs' claim within the VPPA's ambit and instead should read the statute for its plain and ordinary meaning.  Video games are not pre-recorded video tapes or "similar" audio visual materials, and the FAC must be dismissed.

### B.    GameStop is not "engaged in the business" of providing pre-recorded video tapes or similar materials.

---

[1] In any case and as discussed below, GameStop is not "engaged in the business" of selling, renting, or delivering cut scenes.

[2] https://www.nysd.uscourts.gov/jurors/resources-for-jury.

The FAC should further be dismissed for the independent reason that GameStop is not "engaged in the business" of providing pre-recorded video tapes or similar audio visual materials.  18 U.S.C. § 2710(a)(4).  As the FAC itself recognizes, GameStop is a "game retailer," FAC ¶ 2, and trades in video games, not pre-recorded video tape materials as discussed in Section I.A.  Its video game business is not a video tape business as required under the VPPA.

Neither is GameStop engaged in the business of selling or delivering cut scenes.  To satisfy this element, the plaintiff must show that the defendant is "not only . . . substantially involved in the conveyance of video content to consumers but also significantly tailored to serve that purpose." *In re Vizio*, 238 F. Supp. 3d at 1221.  Being "peripherally or passively involved in the delivery" is not enough—rather, providing the relevant video materials must be a "focus" of the business. *Id.*  Here, none of those characteristics are true of GameStop and video game cut scenes.  GameStop is a gaming retailer that sells video games and gaming accessories; the pleadings contain no allegations remotely suggesting that it "significantly tailors" its video game business to delivering cut scenes or that it sells cut scenes as a "focus" of its business. *See McMillan v. Amazon.com, Inc.*, 983 F.3d 194, 199 (5th Cir. 2020) (construing "engaged in the business" and observing, "When the client walks out of the salon, she has shorter hair, but she also has a head full of hair product. . . . Still, a hairdresser is in the business of selling haircuts, not selling handfuls of mousse.  One does not go to the hair salon to acquire a dollop of moisturizing serum and a few spritzes of hairspray."), *certified question answered*, 625 S.W.3d 101 (Tex. 2021).

GameStop of course may sell video games that happen to contain cut scenes, but that happenstance is far from enough to give rise to a VPPA claim.  Like the letter carrier discussed by the *Vizio* court who delivers video content when dropping off a package that happens to

contain a video tape, but ultimately is too peripherally and passively involved in video delivery, GameStop "could not be characterized as 'engaged in *the business*' of delivering" cut scene video content. *In re Vizio*, 238 F. Supp. 3d at 1221. Its business is "in no way tailored to delivering [games] that contain [cut scenes] as opposed to any other [games]," and any allegations to the contrary would be absurd. *Id.* Unlike in *Vizio*, Plaintiffs here cannot plausibly plead that GameStop's products "are designed to enable consumers to seamlessly access [cut scene] content," *id.* at 1222, because the opposite is true: GameStop customers are not granted any direct access to cut scenes and can watch them only by purchasing and playing the video game itself (if it even contains such a cut scene). Neither can Plaintiffs plausibly allege that GameStop "advertises its [products] as 'a passport to a world of [cut scenes]'" or that it "charges consumers a premium" to access cut scenes as in *Vizio. Id.* As the FAC recognizes, video games are what "Defendant's website advertises and sells." FAC ¶ 21.

GameStop's business markedly differs from other entities found to have been "engaged in the business" of pre-recorded video tapes and similar audio visual materials. *See, e.g.*, *In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 799 (N.D. Cal. 2019) (allegations "that Facebook 'regularly delivers' video content to users and maintains a cache of videos and visual materials, including from content providers like Netflix, for their delivery to users"); *In re Vizio*, 238 F. Supp. 3d at 1222 (allegations "that Vizio has developed a product intimately involved in the delivery of video content to consumers, has created a supporting ecosystem to seamlessly deliver video content to consumers (including entering into agreements with content providers such as Netflix and Hulu), and has marketed its product to consumers as a 'passport' to this video content"). At least one court has suggested that the VPPA does not apply to video game consoles. *See In re Vizio*, 238 F. Supp. 3d at 1222 (concluding that "[m]ost of" a

14

list of products, one of which is video game consoles, "are far too peripherally or passively involved in the delivery of video content" to fall within the VPPA).  As with video game consoles, so too with video game retailers.  GameStop is not "engaged in the business" of selling video tapes and, on this independent basis, the FAC should be dismissed.

## II.     GameStop Does Not Knowingly Disclose Personally Identifiable Information

Even if the VPPA applies to video game retailers, Plaintiffs cannot plausibly allege that GameStop knowingly discloses personally identifiable information ("PII").  To plead a disclosure of PII, Plaintiffs must allege that GameStop conveyed information "identif[ying]" both the "specific video materials or services" requested or obtained, and the person who "requested or obtained" that material.  18 U.S.C. § 2710(a)(3).  A viable VPPA claim thus requires "three distinct elements": "the consumer's identity; the video material's identity; and the connection between them."  *In re Hulu Priv. Litig.*, 86 F. Supp. 3d 1090, 1095 (N.D. Cal. 2015) (emphasizing that "[t]he point of the VPPA . . . is not so much to ban the disclosure of user or video data; it is to ban the disclosure of information connecting a certain user to certain videos").  Here, even if cut scenes were covered by the VPPA, a video game purchase does not reveal the specific video materials or services sought, and the pleadings assert no more than a purported disclosure of unidentified purchase data, which is not PII as a matter of law.

### A.     A video game purchase does not reveal the specific video material a person requested or obtained.

The VPPA is concerned with the disclosure of the "specific" video materials or services that a person "requested or obtained."  *Id.* § 2710(a)(3) (defining "personally identifiable information").  By their plain meaning, both "request" and "obtain" refer to a person's purposeful asking for or attaining of something.  Request, Merriam-Webster, https://www.merriam-webster.com/dictionary/request ("the act or an instance of asking for

15

something"); Obtain, Merriam-Webster, https://www.merriam-webster.com/dictionary/obtain

("to gain or attain usually by planned action or effort").  Applying these dictionary definitions,

courts have construed PII to refer to information on a person's "viewing choices," *Robinson v.

Disney Online*, 152 F. Supp. 3d 176, 184 (S.D.N.Y. 2015), "video viewing preferences," *Ellis v.

Cartoon Network, Inc.*, 803 F.3d 1251, 1253 (11th Cir. 2015), and "video-watching behavior,"

*Wilson v. Triller, Inc.*, No. 21-CV-11228 (JSR), 2022 WL 1138073, at *5 (S.D.N.Y. Apr. 18,

2022) (citing in part *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985 (9th Cir. 2017)).

Plaintiffs here attempt to plead the disclosure of video viewing choices and behavior by

alleging that GameStop shares information "identify[ing] a purchased video game."  *See, e.g.*,

FAC ¶ 30.  But even under Plaintiffs' theory, this fails to allege a disclosure of video viewing

preferences, because it is the brief scenes within a game—and not the game itself—that is

supposedly the "similar audio visual material."  Disclosing the video game title is not the same

as sharing what video clips a person requested, watched, or purchased: video games do not

necessarily contain cut scenes and many video games in fact do not contain any cut scenes.

More critically, however, a video game sale does not reveal "information which identifies" what

specific video materials a person requested or prefers.  In purchasing a video game, the customer

is not requesting to view a particular cut scene; he or she is simply seeking to play a particular

video game.  Consumers after all have no ability to select their desired cut scene—GameStop

customers cannot pick and choose what cut scenes accompany a particular video game; they

simply receive whatever cut scenes the game developer happened to include in the video game.

A game purchase thus reflects no personal video viewing choice, preference, or behavior, any

more than an airplane traveler chooses the safety video that the airline chooses to play or a

baseball fan chooses what he or she sees on the jumbotron.  Disclosing a flight someone took or

a ballgame someone attended does not plausibly constitute disclosure of what video materials a person requested or obtained, just like disclosing game purchase data does not reveal a person's video-viewing habits.

Moreover, a video game purchase does not reveal the "specific" video materials that a person watched.  Unlike with a video tape rental or purchase, it is not reasonable to infer that a person who purchased a video game to play also watched the accompanying cut scenes.  Each cut scene is generally skippable, as seen in the FAC's Figure 22.  *See* FAC at 21, Fig. 22 (showing "Skip" button at bottom right-hand corner).  And where a video game does contain cut scenes, they are interspersed throughout the game as brief snippets not named or otherwise identifiable as standalone audio visual works.  The FAC does not at all explain how GameStop would identify to Facebook whether a player watched any cut scenes, much less which specific cut scenes the player watched.  At most, the pleadings assert that GameStop purportedly discloses purchases of certain video games, that happen to be accompanied by brief, unnamed scenes, in the same way that instructional videos may be included in purchases of home appliances, or a brief video interview with an author may accompany an audiobook.  In all of these instances the purchaser chose a different product that was incidentally accompanied by video that the purchaser exercised no preference in obtaining.  This does not suffice under the VPPA.

No court has applied the VPPA beyond viewing, purchase, and rental records of specific films, television shows, or video clips.  *See, e.g.*, *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 986 (9th Cir. 2017) (disclosure of "names of the videos that he watched"); *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 269 (3d Cir. 2016) (disclosure of "which videos a child watches"); *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1254 (11th Cir. 2015) (disclosure of "a

list of the videos he viewed"); *Wilson v. Triller, Inc.*, No. 21-CV-11228 (JSR), 2022 WL 1138073, at *2 (S.D.N.Y. Apr. 18, 2022) (disclosure of "videos the user has loaded, played or liked"); *Robinson v. Disney Online*, 152 F. Supp. 3d 176, 178 (S.D.N.Y. 2015) (disclosure of "each time they use the Disney Channel to watch videos or television shows").  In the face of such unequivocal precedent, this Court should decline Plaintiffs' invitation to expand the VPPA to sweep in data on video game purchases and dismiss the FAC.

> **B.    Technical documentation confirms that GameStop did not disclose information linking purchase data to any individual.**

The FAC not only fails to properly plead that GameStop discloses any information that identifies the person allegedly viewing the cut scenes, but it includes information that shows Gamestop does not make such disclosures.  To make out a cognizable VPPA claim, Plaintiffs must plausibly allege that the information disclosed by GameStop "identif[ies] a *particular* person—not just an anonymous individual—and connect[s] this particular person with his or her viewing history."  *Robinson*, 152 F. Supp. 3d at 179.  This is consistent with every court to have considered the issue: "The plain language of the statute suggests, and the Senate Report confirms, that the statute protects personally identifiable information that identifies a specific person and ties that person to particular videos that the person watched."  *In re Hulu Priv. Litig.*, No. C 11-03764 LB, 2014 WL 1724344, at *8 (N.D. Cal. Apr. 28, 2014).  "The point of the VPPA, after all, is not so much to ban the disclosure of user or video data" but "to ban the disclosure of information connecting a certain user to certain videos."  *In re Hulu*, 86 F. Supp. 3d at 1095.  To try to meet this pleading burden, the FAC here asserts four theories of disclosure, all of which fail.

> *1.   Unidentified purchase data is not personally identifiable information.*

First, the purchase data allegedly shared by GameStop does not contain any identifiers.

The majority rule defines personally identifiable information ("PII") as "the kind of information that would readily permit an ordinary person to identify a specific individual's video-watching behavior." *Wilson v. Triller, Inc.*, No. 21-CV-11228 (JSR), 2022 WL 1138073, at *5 (S.D.N.Y. Apr. 18, 2022) (citation omitted).  In other words, PII "must, without more, itself link an actual person to actual video materials." *Robinson v. Disney Online*, 152 F. Supp. 3d 176, 180 (S.D.N.Y. 2015) (citation omitted).  This is the position adopted by the majority of courts to address this issue, including at least two courts in this District.  *See, e.g.*, *Wilson*, 2022 WL 1138073, at *6; *Robinson*, 152 F. Supp. 3d at 180; *see also Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985 (9th Cir. 2017)); *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d. 262, 290 (3d Cir. 2016).  Here, while the FAC asserts that GameStop discloses purchase data to Facebook, missing is any allegation that such purchase data contains a personal identifier.  For example, Plaintiffs plead that GameStop may disclose to Facebook "event data," like whether a button is clicked, but makes no allegations that such data contains personally identifiable information.  FAC ¶ 23; *see also id.* at 17, Fig. 19 (showing list of numbers, events like "PURCHASE," and dates, but no video game titles).  This does not qualify as PII under the VPPA, and warrants dismissal.

### 2.  *Facebook's cookies are not personally identifiable information.*

The information Facebook obtains via cookies also does not constitute a disclosure of PII by GameStop.  The FAC identifies three cookies that purportedly transmit information to Facebook.  The cookies, however, are not PII.  Even if they were, the cookies are stored on the user's browser and transmitted by the user to Facebook, not sent by GameStop.

The "c_user" and other Facebook cookies named are not PII because cookies are not "the kind of information that would readily permit an ordinary person to identify a specific individual's video-watching behavior." *Wilson*, 2022 WL 1138073, at *5 (citing *In re Nickelodeon*, 827 F.3d at 290).  A cookie is accessible only to the specific website that wrote the

19

cookie: "The only servers that can access a particular cookie are those associated with the domain that wrote the cookie.  That means that [a defendant] can read only [its own] cookies, and it cannot read . . . facebook.com cookies."  *In re Hulu*, 2014 WL 1724344, at *4 (citation omitted).  A court in this District denied a plaintiff's preliminary injunction in part on this basis, that Facebook's "fr" cookie was not clearly PII under the VPPA.  *Bernardino v. Barnes & Noble Booksellers, Inc.*, No. 17CV04570LAKKHP, 2017 WL 3727230, at *9 (S.D.N.Y. Aug. 11, 2017) ("[T]here is case law to support Barnes & Noble's position that the alleged disclosure [of Facebook's 'fr' cookie] may not constitute PII . . . ."), *report and recommendation adopted*, No. 17-CV-4570 (LAK), 2017 WL 3726050 (S.D.N.Y. Aug. 28, 2017).

Plaintiffs here try to obfuscate cookie technology by portraying the relevant PII at issue as Facebook IDs, allegedly contained within Facebook's "c_user" cookie and capable of identifying a Facebook user.  *See, e.g.*, FAC ¶ 40.  Critically, however, Facebook IDs are not what GameStop is alleged to have "compelled" web browsers to disclose.  Rather, it is Facebook's cookies, not the Facebook ID, that were purportedly transmitted to Facebook.  *See id.* ¶¶ 31, 32, 42-44 (each allegation asserting that GameStop "compels a visitor's browser to transmit to Facebook the c_user cookie" or other "cookies").  Like all cookies, Facebook's cookies can only be read by the user and by the server that placed the cookies—Facebook. Taking the allegations as pleaded, the key question is whether an ordinary person would be able to identify an individual based on the cookies.  That answer is a resounding "no," because no party other than Facebook is able to read Facebook's cookies, much less extract information contained therein to identify a specific person.  The cookies are not PII, and Plaintiffs cannot

state a VPPA claim based on their alleged disclosure.[3]

The fact that Facebook alone may be able to read the c_user cookie to identify a user is not enough to render the cookie PII.  The statute defines PII as "information which identifies," 18 U.S.C. § 2710(a)(3)—"not information disclosed by a provider, plus other pieces of information collected elsewhere by non-defendant third parties," *Robinson*, 152 F. Supp. 3d at 182; *Eichenberger*, 876 F.3d at 985 ("[The VPPA] looks to what information a video service provider discloses, not to what the recipient of that information decides to do with it.").  It follows that PII "must have the same meaning without regard to its recipient's capabilities." *Eichenberger*, 876 F.3d at 985.  The alternate reading has been expressly rejected by the two courts in this District to have addressed the issue: in *Robinson*, the court noted that the definition of PII would be meaningless if the term turned on "what third parties might conceivably be able to do" with a disclosure.  152 F. Supp. 3d at 181.  Likewise in *Wilson*, the court opined that "[i]t would make little sense for the scope of PII to be recipient-dependent" based on the statutory text.  2022 WL 1138073, at *6.  Here, the fact that Facebook alone may be able to extract a user's Facebook ID from a Facebook cookie does not render the c_user cookie PII.[4]

---

[3] A decision by a district court in the Northern District of California does not change this conclusion.  *See Stark v. Patreon, Inc.*, No. 22-CV-03131-JCS, 2022 WL 7652166, at *7-8 (N.D. Cal. Oct. 13, 2022) (not dismissing VPPA claim).  That court was misled by the same tale spun by Plaintiffs here—the inaccurate assertion that "the information shared with Facebook includes the user's Facebook ID" rather than coded Facebook cookies that other parties cannot read.  *See* Compl. ¶ 3, *Patreon*, No. 22-CV-03131-JCS (N.D. Cal. May 27, 2022).  Unlike here, however, the defendant there did not object to this inaccuracy and did not raise the other arguments raised in this Section B.  Because that decision does not at all address the issues presented here, it lacks even persuasive value and does not resolve the FAC's deficiencies.

[4] The allegations about the "_fbp" and "fr" cookies suffer from the additional flaw that, by Plaintiffs' own admission, the cookies allow Facebook to collect encrypted Facebook IDs and browser identifiers.  FAC ¶¶ 33, 35.  An encrypted ID or browser identifier would not identify a specific person so as to constitute PII, even if GameStop does disclose them.  For example, the FAC alleges that the "fr" cookie transmitted strings of numbers and letters such as "0W3d3FkEC2jPGTiY..." and "0Em9HNk..." FAC at 14, Figs. 17-18.  These number and letter combinations are plainly inscrutable to "an ordinary person" and do not qualify as PII.  Courts have held that digital identifiers, even in unencrypted form, do not constitute PII.  *See Wilson*, 2022 WL 1138073, at *6 (user identification numbers); *Eichenberger*, 876 F.3d at 986 (Smart TV serial numbers); *Ellis v. Cartoon Network, Inc.*,

### 3. *GameStop does not disclose the cookie—the user's browser does.*

Even if the cookie data were PII (which they are not), such disclosures are not actionable against GameStop because GameStop is not the one doing the disclosing.  According to the Facebook documentation repeatedly incorporated by referenced into the FAC, the "c_user" and other Facebook cookies cited are placed by Facebook on a user's web browser—regardless of whether the user visits gamestop.com.  *See* Cookies & Other Storage Technologies, Meta, https://www.facebook.com/policy/cookies ("Facebook's Cookie Documentation") (incorporated by reference at FAC ¶ 33 nn.37-38, ¶ 36 n.39, ¶ 37 n.41).[5]  Facebook states of the c_user cookie, for example, that "We [i.e., Facebook] use cookies to keep you logged in as you navigate between Facebook Pages," that "Cookies also help us [i.e., Facebook] remember your browser so you don't have to keep logging in to Facebook," and that "we [i.e., Facebook] use the 'c_user' and 'xs' cookies, including for this purpose."  Facebook's Cookie Documentation.  That same documentation by Facebook also identifies the other two cookies cited in the FAC as cookies stored by Facebook and used by Facebook.  *See id.* (identifying "_fbp" and "fr" cookies as Facebook cookies); *see also Bernardino v. Barnes & Noble Booksellers, Inc.*, No. 17CV04570LAKKHP, 2017 WL 3727230, at *1, *8, *9 (S.D.N.Y. Aug. 11, 2017) (repeatedly stating the "fr" cookie belongs to Facebook).  If any doubt remained, Facebook's Cookie Documentation states more than fifteen times that it is Facebook that stores and uses the therein-listed cookies.  *See* Facebook's Cookie Documentation (Facebook repeatedly stating that "we use" the therein-listed cookies).

---

No. 1:14-CV-484-TWT, 2014 WL 5023535, at *3 (N.D. Ga. Oct. 8, 2014) (Android device IDs), *aff'd on other grounds*, 803 F.3d 1251 (11th Cir. 2015).

[5] "In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider . . . documents incorporated by reference in the complaint."  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

Recognizing this factual gap, Plaintiffs do not plead that GameStop creates or stores the cookies.  They instead obfuscate this unfavorable fact by asserting that GameStop "compels" a visitor's browser to transmit Facebook's cookies to Facebook.  *See, e.g.*, FAC ¶ 31.  This allegation is not supported by any facts, is conclusory, and should not be credited.  It is contradicted by the documentation incorporated by reference, which unequivocally states, "We [i.e., Facebook] store information in a cookie that is placed on your browser or device" and "Cookies help us [i.e., Facebook] store preferences."  *See* Facebook's Cookie Documentation. This argument is also irrelevant, because GameStop cannot disclose what it does not have. GameStop does not have the cookie; the user's browser stores the cookie.  The user has complete control over whether she allows Facebook to read her cookies while browsing any third-party website and whether she shares information with Facebook.  As Facebook's documentation explains, "You can control how we use data to show you ads and more," including via "browser or device . . . settings that allow you to choose whether browser cookies are set," "to delete them," and to "disable[] browser cookie use."  *See* Facebook's Cookie Documentation.

4.  *The customer lists allegations are contradicted by public documentation incorporated by reference in the FAC.*

The "customer lists" allegedly shared by GameStop cannot rescue Plaintiff's VPPA claim because such lists do not contain any information about the videos Plaintiff Aldana allegedly watched: customer lists are restricted from containing such data according to Facebook's own documentation incorporated in the FAC.  The FAC repeatedly cites a Facebook support article which states that a business may upload a "customer list" containing certain data fields such as email, phone number, and address.  Create a Customer List Custom Audience, Meta, https://www.facebook.com/business/help/170456843145568?id=24690979533764 (incorporated by reference at FAC ¶ 17 n.27, ¶ 46 n.47).  Those instructions, however, make clear that a

business must fastidiously "[p]repare" and "format[]" the customer list to include only the select set of fields permitted by Facebook, lest errors appear during the upload process.  *Id.*  The list of fields permitted by Facebook do not include video game or other purchase information.  How to Format Customer Lists, Meta, https://www.facebook.com/business/help/ 2082575038703844?id=2469097953376494.  In other words, GameStop could not have disclosed to Facebook a customer list containing video game purchase information, because such data is not within "the information types that Meta accepts."  *Id.*

Plaintiffs proffer no facts contradicting this public documentation cited in the pleadings. While the FAC includes a Figure 21 that states, "They uploaded or used a list to reach you," the image contains no indication that GameStop disclosed video game purchase information or that Facebook targeted advertisements based a person's purchase records.  FAC at 20, Fig. 21. Besides "a list," it does not reference PII at all.  Stripped of these unreliable allegations, all that remain are quotes from Facebook's webpages and conclusory statements.[6]  *See id.* ¶¶ 46-49. That is not enough to support a plausible claim that GameStop disclosed Plaintiff Aldana's video game purchases through customer lists.

## III.    Plaintiffs Do Not Allege a Knowing Disclosure of PII

Even if Plaintiffs adequately alleged the disclosure of PII, the FAC should be dismissed for the additional reason that it does not plausibly allege a knowing disclosure of PII.  18 U.S.C. § 2710(b)(1).  Plaintiffs make the conclusory allegation that GameStop "knowingly collects and discloses its purchasers' personally identifiable information" to Facebook but do not plead actual

---

[6] Even if Plaintiffs plead any actual facts suggesting their purchase information was included in the customer lists (notwithstanding Facebook prohibits as much), at least one court has indicated that email addresses do not necessarily constitute personal information.  *See Dancel v. Groupon, Inc.,* 949 F.3d 999, 1008-09 (7th Cir. 2019) (noting that email addresses do not "categorically identify an individual," only that they may "because of their content, not their inherent nature as email addresses").  Plaintiff Aldana alleges nothing to suggest that the email address he used in patronizing GameStop identified anything other than an email account.

facts that would allow this Court to reasonably infer a knowing disclosure by GameStop.  *See, e.g.*, FAC ¶¶ 2, 4; *see also Iqbal,* 556 U.S. at 678 ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'").  The most the FAC pleads is that "Defendant knowingly disclosed [PII] because it used that data to build audiences on Facebook and retarget them for its advertising campaigns."  FAC ¶ 79.  That statement, however, is conclusory and mixes two things: GameStop's advertising to its own customers via Facebook, and Facebook's independent attempts to purportedly match video game purchases with other sources of data, such through Facebook's cookies.  None of the materials cited in the FAC suggest that GameStop knows what Facebook internally does with its own data. The pleadings point to Figure 19 as proof that Facebook has admitted to matching video game purchases with user profiles, but that Figure simply shows a list of ID numbers, events like "PURCHASE," and dates.  *Id.* at 17, Fig. 19.  It does not identify any video game by name, and does not "confirm[] Facebook has received information identifying what video games a consumer has purchased."  *Id.* ¶ 45.

This failure is fatal to Plaintiffs' case because knowledge under the VPPA requires "consciousness of transmitting the private information"—"that [GameStop] knew that Facebook might combine a Facebook user's identity (contained in the c_user cookie) with the [game purchase information] to yield 'personally identifiable information' under the VPPA."  *In re Hulu*, 86 F. Supp. 3d at 1095, 1097 (reciting VPPA requirement in context of summary judgment motion).  Nowhere does the FAC plead this.  The FAC should be dismissed and no further amendment can save it.

## CONCLUSION

For the above reasons, the FAC should be dismissed with prejudice.

Dated: November 18, 2022              Respectfully submitted,

By: /s/ Sheri B. Pan
    Sheri B. Pan
    ZWILLGEN PLLC
    183 Madison Avenue, Suite 1504
    New York, NY 10016
    Telephone: (646) 362-5590
    sheri@zwillgen.com

    Marc Zwillinger (*pro hac vice* forthcoming)
    Jeffrey Landis
    ZWILLGEN PLLC
    1900 M Street NW, Suite 250
    Washington, DC 20036
    Telephone: (202) 296-3585
    Facsimile: (202) 706-5298
    marc@zwillgen.com
    jeff@zwillgen.com

    *Counsel for Defendant*